J-A23040-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ROBERT J. CAVOTO, JR., INTERNATIONAL HEALTH ALLIANCE, INC., CAVOTO CHIROPRACTORS, P.C. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., DION ROSENAU SMITH MENZAK & AARON, AND LEE H. ROSENAU | : : : : | No. 1085 EDA 2017 |

Appeal from the Judgment Entered May 24, 2017
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 050601630

BEFORE:   PANELLA, DUBOW, and FITZGERALD,* JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED DECEMBER 18, 2017**

Appellants, Robert J. Cavoto, Jr. ("Cavoto"), International Health Alliance, Inc., and Cavoto Chiropractors, P.C., appeal from the judgment entered in favor of Appellees, State Farm Mutual Automobile Insurance Co., Dion Rosenau Smith Menzak & Aaron, and Lee H. Rosenau.[1]   Appellants

_____

* Former Justice specially assigned to the Superior Court.

[1] We note that the trial court, in its initial order dated January 30, 2006, erroneously responded to "**Defendants'** preliminary objections," when preliminary objections were actually only filed by State Farm while the remainder of Appellees filed a joint "answer with new matter."  However, all Appellees contended that Appellants failed to set forth a legally cognizable claim for "abuse of process" and the court agreed by dismissing the claim.

J-A23040-17

present numerous arguments regarding their claims for defamation, abuse of

process, tortious interference, and conspiracy.  We affirm.

We adopt the facts and procedural history set forth by the trial court's

comprehensive opinion.  **See** Trial Ct. Op., 3/3/17, at 1-3.  In this timely

appeal, Appellant raises the following nineteen issues for review:

> A. Whether the trial court erred in permitting [] Rosenau to testify regarding the Dickman letter because the document was not authenticated?
>
> B. Whether the trial court erred in permitting [] Rosenau to testify regarding the Dickman letter because the document constitutes inadmissible, double hearsay?
>
> C. Whether the trial court erred in permitting the letter to be introduced "as to the date" because such information is also inadmissible hearsay, as well as extremely prejudicial to [Appellants]?
>
> D. Whether the trial court erred in permitting misleading characterization(s) regarding the March letter during closing, as well as further mention of the date?
>
> E. Whether the trial court erred in responding to the jury's request to see the March 2004 Letter and the request to hear testimony regarding the document?
>
> F. Whether the trial court erred in permitting, and then refusing to strike, [] Rosenau's testimony regarding his alleged 2004 billing records?
>
> G. Whether the trial court erred in refusing to charge the jury with Pennsylvania Standard Jury Instruction § 5.30 for

Moreover, Appellees did not seek clarification in the trial court and do not raise this error on appeal.  Therefore, the issue is waived.  **Moranko v. Downs Racing LP**, 118 A.3d 1111, 1117 n.3. (Pa. Super. 2015) (*en banc*), *appeal denied*, 132 A.3d 459 (Pa. 2016)

- 2 -

adverse inference, due to [] Rosenau's failure to produce the 2004 billing records?[2]

H. Whether the trial court erred in dismissing [Appellants'] abuse of process claims?

I. Whether the trial court erred in excluding ample and significant evidence on the basis of judicial privilege?

J. Whether the trial court erred in excluding statements not specifically pled in the amended complaint when such statements constitute acts of tortious interference and conspiracy?

K. Whether the trial court erred in excluding State Farm's Midtown memo and the testimony of Mr. John Smith?

L. Whether the trial court erred in excluding the testimony of Ms. J'Amy Kluender?

M. Whether the trial court erred in excluding the testimony of Mr. Gary Heslin regarding Mr. Fred Smith's comments about State Farm's $1,000,000 threshold and "hardball" tactics?

N. Whether the trial court erred in excluding the testimony of Mr. Robert Datner?

O. Whether, based solely on the admitted evidence, the [t]rial [c]ourt erred by granting non-suit in favor of State Farm on the count of Defamation when State Farm's defamation was established through the principles of agency?

P. Whether, based solely on the admitted evidence, the trial court erred by granting non-suit in favor of all [Appellees] on the count of conspiracy?

---

[2] Appellants have abandoned their claim that the trial court erred in refusing an adverse inference jury instruction by failing to develop the claim in their brief.

Q. Whether, based solely on the admitted evidence, the trial court erred by granting non-suit in favor of Mr. Rosenau on the count of tortious interference when an act of defamation also constitutes tortious interference?

R. Whether the trial court erred as a matter of law by granting non-suit when improperly excluded evidence would have established a *prima facie* cause of action on all Counts?

S. Whether, based on the above-listed errors, th[is] Court should remove non-suit and grant [Appellants] a new trial on all counts?

Appellants' Brief at 3.[3]

Appellants' first five issues concern the admission of a letter ("Dickman letter") which was purportedly written by Appellants' former attorney detailing an alleged defamatory conversation. Appellants claim the letter was not properly authenticated, contained statements constituting hearsay, and was unduly prejudicial. *Id.* at 22-26. Appellants also assert that Appellees improperly discussed the letter and mischaracterized the letter's contents during closing argument. *Id.* at 26. Appellant further claims that the trial court improperly refused the jury's request to see a copy of the letter during deliberations or to have testimony regarding the letter reread during deliberations. *Id.* at 27.

---

[3] We note that Appellants' brief violates several rules of appellate procedure. Appellants' brief exceeds thirty pages and does not contain a certification of compliance with the 14,000 word count limit. *See* Pa.R.A.P. 2135(a). Nevertheless, we decline to quash. *See* **PHH Mortg. Corp. v. Powell**, 100 A.3d 611, 615 (Pa. Super. 2014) (refusing to quash appeal despite numerous violations of appellate briefing rules).

Appellants' next issue focuses on the trial court's admission of billing records. They argue that the trial court improperly permitted Appellee Rosenau to testify regarding his billing records when those records were not introduced into evidence. *Id.* at 27-28.

Appellants, in their eighth issue, assert that the trial court erred by dismissing, pre-trial, their count for abuse of process for failure to state a legally cognizable cause of action. They argue that they sufficiently pleaded allegations that Appellees utilized discovery and depositions, in other unrelated cases, in an attempt to harm Appellants. *Id.* at 29-32.

In their ninth issue, Appellants contend that the trial court abused its discretion by excluding testimony based on judicial privilege. Specifically, they assert that the statements in question were made outside the scope of the privilege during depositions unrelated to the instant case. *Id.* at 32-34.

In their tenth issue, Appellants argue that the trial court erred by refusing to consider alleged defamatory statements not specifically pled in their amended complaint. *Id.* at 44-47. Appellants allege they adequately asserted their claims for tortious interference with an existing and prospective business relationship and civil conspiracy, and that defamatory statements uncovered during discovery should have been admitted at trial. *Id.* at 46-47.

Appellants' eleventh issue challenges the trial court's ruling that excluded evidence arising after the date of Appellants' complaint in August 2015. They argue that a memo, which purportedly detailed State Farm's use

of "shadow discovery," was admissible as evidence of a bad act under Pa.R.E. 404(b). *Id.* at 48. Additionally, Appellants assert that testimony from an individual who stopped patients referring to Appellant Cavoto should have been admitted to show causation and damages. *Id.* at 49-50.

Appellants next three issues generally object to the trial court's decision to decline to admit testimony from former employees of State Farm and other individuals who purportedly had knowledge of State Farm's tactics. *See id.* at 50-56.

Finally, in their last five issues, Appellants contend that the trial court erred by granting non-suit regarding their claims for defamation as to Appellee State Farm, and for conspiracy and tortious interference against all Appellees. *Id.* at 56-65. Appellants argue that trial evidence did not support the trial court's ruling, and that the excluded evidence would have been sufficient to support the above causes of action. *Id.* at 56-65.

After a thorough review of the record, the briefs of the parties, the applicable law, and the forty-page opinion of the Honorable Judge Gary Glazer, we conclude the trial court's opinion comprehensively discusses and properly disposes of the issues presented. *See* Trial Ct. Op. at 3-40 (finding that (1) Appellants failed to preserve any challenge to the authenticity of the Dickman letter; (2) the Dickman letter was properly admitted as an admission of a party opponent for the limited purpose of establishing the date of an alleged conversation for purposes of the statute of limitations; (3) the Dickman letter

was probative for purposes of the statute of limitations; (4) the jury was properly prohibited from viewing the entire contents of the Dickman letter when it was admitted for only a limited purpose; (5) the court acted within its purview when allowing the jury to rehear portions of testimony regarding the Dickman letter during deliberations; (6) Appellee Rosenau properly refreshed his recollection by reviewing his billing records prior to trial; (7) Appellants failed to sustain an abuse of process claim because they could not establish that Appellees attempted to use "shadow discovery tactics" for the sole purpose of causing harm to Appellants; (8) the judicial privilege precluded all testimony which concerned statements made during the course of judicial proceedings, such as depositions; (9) Appellants failed to plead each defamatory statement ultimately alleged with sufficient particularity; (10) evidence occurring after the commission of the lawsuit was properly excluded as unduly prejudicial with minimal probative value; (11) testimony from former employees of State Farm was too attenuated and prejudicial to be properly admitted; (12) Appellants' tortious interference claim failed because Appellants could not prove that either a contractual relationship existed or that the one possible incidence of defamation which was not barred by judicial privilege was not within the one-year statute of limitations; (13) insufficient evidence supported Appellants' claims for tortious interference, defamation, and conspiracy and, therefore, nonsuit was proper). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment affirmed.[4]

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2017

---

[4] On October 23, 2017, Appellants filed a post-submission communication, after this Court had conducted oral argument. As noted in Appellees' motion to quash Appellants' submission, Appellants violated Pa.R.A.P. 2501(a) which mandates that "[a]fter the argument of a case had been submitted, no brief, memorandum or letter relating to the case shall be presented or submitted, either directly or indirectly, to the court or any judge thereof, except upon application or when expressly allowed at bar at the time of the argument." Pa.R.A.P. 2501(a). Accordingly, we quash Appellants' post-submission communication but note that, in any event, the communication merely reiterates arguments Appellants already set forth both during argument and within their appellate brief. However, we do not find the communication to be "dilatory, obdurate or vexatious," as urged by Appellees. **See** Pa.R.A.P. 2744 Thus, we do not conclude that the award of counsel fees is appropriate in this case. **See id.** (stating an appellate court may award a reasonable counsel fee where "it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious").

Additionally, Appellees have filed a motion to seal an exhibit contained in Appellants' answer to Appellees' motion to quash. We grant the motion to seal and direct the Prothonotary of this Court to seal Appellant's "Brief in Opposition to Appelle's Motion to Strike."

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| ROBERT J. CAVOTO, JR., INTERNATIONAL HEALTH ALLIANCE, INC. CAVOTO CHIROPRACTORS, P.C., TIPROF, INC., and PENN CENTER PAIN MANAGEMENT, INC., | : : : : : : : | JUNE TERM, 2005 NO. 01630 COMMERCE PROGRAM |
| Plaintiffs v. | : : : | |
| STATE FARM MUTUAL AUTOMOBILE INS. CO., et al. | : : : | |
| Defendants | : | |

GLAZER, J.

March 3, 2017

**OPINION**

This lawsuit spanned over a decade and culminated with a jury verdict that found the lawsuit was filed untimely. On June 17, 2005, Dr. Robert Cavoto, Jr. ("Cavoto"), International Health Alliance, Inc., Cavoto Chiropractors, P.C., Tiprof, Inc., and Penn Center Pain Management, Inc. (collectively "plaintiffs") filed a lawsuit against State Farm Mutual Insurance Company ("State Farm"), and Lee H. Rosenau ("Rosenau") and his law firm, Dion, Rosenau, Smith, Menszak & Aaron (collectively "defendants"), for defamation, abuse of process, tortious interference, and conspiracy.

## PROCEDURAL HISTORY AND FACTS

Cavoto is a Philadelphia area chiropractor and owner of the plaintiff businesses. His business relies upon telemarketing and personal injury attorney referrals in order to generate clientele. He alleges State Farm sought to put him out of business by tarnishing his reputation in

the legal community and using "hardball" litigation tactics in lawsuits that involved his offices.[1]

Rosenau, as a frequent counsel for State Farm insureds over the past four decades, was allegedly the one who carried out this plan through depositions and his contacts with area attorneys.[2]

At the time complained of, State Farm was investigating Cavoto for fraud. The catalyst for the investigation was complaints from State Farm insureds who were recently involved in car accidents. The insureds complained they were getting telemarketing calls from an individual—posing as a State Farm representative—suggesting they seek medical treatment. State Farm eventually traced these calls to Marge Fisher ("Fisher") and Cavoto.

Prior to trial, the parties submitted forty-five motions in limine to exclude evidence or testimony. After ruling on those motions and four days of trial, plaintiffs were able to produce one conversation from which the jury could conclude Rosenau had defamed Cavoto—a telephone conversation between Rosenau and Marc Bendo, Esquire ("Bendo").

At the close of the evidence, defendants moved for a nonsuit on all claims, which this court granted almost in its entirety—denying only the motion for nonsuit on the defamation claim against Rosenau due to his telephone conversation to Bendo.

Because defendants raised the statute of limitations as a defense, when that conversation took place was a relevant question. Accordingly, the parties submitted a jury verdict sheet that asked when the conversation took place. Cavoto alleged the conversation took place "within [a] year" of June 17, 2005.[3] Bendo felt it took place around Christmas-time of 2004.[4] Defendants

---

[1] Compl. ¶¶ 1,14-15.
[2] Compl. ¶¶ 31-57.
[3] Compl. ¶ 66.
[4] Record, 10/31/2016, *123, 10-11. ("*" designates page number).

2

argued it took place in March 2004 based on Rosenau's billing records and a letter written by Cavoto's attorney purporting to summarize the conversation.[5]

The jury returned a verdict finding the conversation took place prior to June 17, 2004.[6] As a result, plaintiffs' suit was barred by the statute of limitations.

## DISCUSSION

Before the court is plaintiffs' post-trial motion, in which plaintiffs claim several errors with respect to this court's evidentiary rulings prior to and during trial. Plaintiffs argue the errors prejudiced their ability to present their case and warrant this court granting a new trial.

This court finds all errors complained of lack merit or were harmless. Therefore, plaintiffs' motion for a new trial is denied.

### I. Standard of Review

The admission or exclusion of evidence is within the sound discretion of the trial court and is reversed only upon finding a clear abuse of discretion or misapplication of the law.[7] An abuse of discretion must be shown by clear and convincing evidence.[8] Furthermore, "to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party."[9]

To raise a claim of error in post-trial proceedings, the error must have been raised pre-trial or at the time of trial.[10] The party's post-trial motion must specify how that requirement was complied with, and any error without such specification is deemed waived.[11]

---

[5] Record, 11/8/2016, *67, 14-22; *Id.* at *65, 18-25.
[6] *Id.* at 127, 10-13.
[7] *Gaston v. Minhas*, 938 A.2d 453, 455 (Pa. Super. Ct. 2007).
[8] *Paulone v. Paulone*, 649 A.2d 691, 692 (Pa. Super Ct. 1994).
[9] *Am. Fture Sys., Inc. v. BBB*, 872 A.2d 1202, 1212 (Pa. Super Ct. 2005).
[10] *See* Pa.R.C.P. 227.1(b)(1)
[11] *See Id.* (b)(2).

3

Therefore, any error not explained within plaintiff's memorandum of law is waived and will not be addressed in this opinion.[12]

## II. Plaintiff Failed to Establish the Basic Elements of an Abuse of Process Claim.

In January 2006, this court sustained defendants' preliminary objection to plaintiffs' claim for abuse of process. In their complaint, plaintiffs alleged that defendants used depositions in personal injury lawsuits for an improper purpose—namely, to investigate Cavoto.[13]

Abuse of process is the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process."[14] In order to establish a prima facie case for abuse of process, the plaintiff must establish that the "defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff."[15]

Plaintiffs believe they established a case for abuse of process by alleging "that Defendants utilized discovery tactics (in cases where Plaintiffs were not even parties) in order . . . [to] dissuade others from associating or doing business with Plaintiff."[16] However, it is because "plaintiffs were not even parties" in those actions that an abuse of process claim was not established. Defendants' discovery tactics were used against the personal injury plaintiffs, not Cavoto. Since Cavoto was not a party in those actions, it was impossible for defendants to coerce any desired result from him. Therefore, plaintiffs' abuse of process claim was properly dismissed.

---

[12] Plaintiff raised several errors in its post-trial motion that are not included in its post-trial memorandum of law. Because the failure to address them in the memorandum results in non-compliance with Pa.R.C.P. 227.1, the claims of error are deemed waived.

[13] Compl. ¶¶ 134-36.

[14] *McGee v. Feege*, 535 A.2d 1020 (Pa. 1987).

[15] *Werner v. Plater-Zyberk*, 799 A.2d 776 (Pa. Super. Ct. 2002).

[16] Pl. Post-Trial Memo, *33.

4

III. Plaintiffs Failed to Establish Defendants' Conduct Interfered With Any Contractual or Prospective Contractual Relationship

Plaintiffs contend this court erred on rulings with respect to their claim for tortious interference with contractual relations in two ways. First, plaintiffs argue this court's grant of nonsuit was error because a defamatory statement constitutes tortious interference, and the defamation claim against Rosenau survived defendants' motion.[17] Second, they argue this court erred in excluding defamatory statements that were not specifically pled in the complaint because they could have been used to establish a claim for tortious interference.[18]

In order to state a claim for intentional interference with prospective or existing contractual relations, the plaintiff must show:

> "(1) *the existence of a contractual, or prospective contractual relation* between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) *the occasioning of actual legal damage as a result of the defendant's conduct.*"[19]

Plaintiffs argue defendants' conduct injured their contractual relations with personal injury attorneys and employees. However, Cavoto explicitly denied having any referral or contractual relationship with personal injury attorneys.[20] As such, there was no contractual relationship that could be interfered with.

---

[17] Pl. Post-Trial Memo, *59.

[18] Pl. Post-Trial Memo, *45.

[19] *Maverick Steel Co., LLC v. Dick Corp./Barton Malow*, 54 A.3d 352, 355 (Pa. Super Ct. 2012) (emphasis added).

[20] Record, 11/4/2016, *25, 14 - *26, 16.

With respect to employee relationships affected, plaintiffs presented Dr. Anice LeBeouf ("LeBeouf")—a chiropractor who formerly worked for Cavoto.[21] LeBeouf testified she resigned from Cavoto's employment partly because of State Farm's investigation into Cavoto.[22]

However, while defendants' conduct may have been the cause of her resignation, defendants cannot, as a matter of law, be held liable for conducting investigations into possible insurance fraud. Pennsylvania courts have granted a conditional privilege to insurance companies for conducting these types of investigations because of the belief that it is in society's best interest to expose fabricated insurance claims.[23] Moreover, the mere existence of litigation cannot be the basis for a tortious interference claim.[24]

This court aligns with those courts and declines to chill the important investigative function of insurance companies. Therefore, this court finds the grant of non-suit on the claim of tortious interference against all defendants was proper.

## IV. Plaintiffs' Claim of Defamation.

Since plaintiffs failed to plead the necessary elements of a tortious interference or abuse of process claim, defendants' conduct and statements could only be used to establish a claim for defamation.

To establish a claim for defamation, a must private figure plaintiff must prove:

> "(1) The defamatory character of the communication; (2) its
> publication by the defendant; (3) its application to the plaintiff; (4)
> the understanding by the recipient of its defamatory meaning; (5)
> the understanding by the recipient of it as intended to be applied to

---

[21] Record, 11/1/2016, *47, 13-15.

[22] Record, 11/1/2016, *51, 20-25.

[23] See *Chicarella v. Passant*, 494 A.2d 1109, 1113 (Pa. Super. Ct. 1985); See also *Forster v. Manchester*, 189 A.2d 147, 150 (Pa. 1963) (finding conditional privilege existed immunizing insurance company from invasion of privacy liability for following and documenting movements of an injured claimant because "it is in the best interests of society that valid claims be ascertained and fabricated claims be exposed.")

[24] See *Pelagattl v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super Ct. 1987) (upholding trial court sustaining preliminary objections because the existence of an earlier lawsuit filed by the defendant against the plaintiff cannot be the basis of defamation or tortious interference claims since a lawsuit is absolutely judicially privileged).

6

the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion."[25]

Under certain circumstances, attorneys, witnesses, judges, and victims are accorded absolute immunity from liability for defamation—otherwise known as the judicial privilege. The privilege prohibits any of their statements—which are made in the course of a judicial proceeding, and which are even minimally pertinent and material to the redress sought in that proceeding—from being introduced into evidence in a later suit for defamation.[26]

Here, the judicial privilege applied to bar the testimony of many of plaintiffs' witnesses. Plaintiffs were able to present one witness—Bendo—who could establish defamatory statements made by Rosenau. Nevertheless, the jury determined the statements occurred prior to June 17, 2004, and, therefore, were beyond the one-year statute of limitations for a defamation claim.

As such, plaintiffs' claim for defamation similarly failed.

A. Defamatory Statements Must Be Pled in the Complaint.

Initially, this court notes plaintiffs' complaint for defamation failed to adequately comply with Pennsylvania case law and procedure.

Each defamatory statement is a separate cause of action, which must be pled with particularity.[27] That means, the face of the complaint must state, specifically, "What allegedly defamatory statements were made, and to whom they were made."[28]

---

[25] *Kelley v. Pittman*, 150 A.3d 59, 67 (Pa. 2016) (quoting 42 Pa.C.S.A. § 8343).

[26] *Richmond v. McHale*, 35 A.3d 779, 784 (Pa. Super. Ct. 2012); *see also Freundlich & Littman, LLC v. Feierstein*, 2017 WL 712911 at *3 (Pa. Super. Ct. 2017) ("Courts have continually protected a variety of communications made at various proceedings as well as *statements with only minor relation to the underlying case*.") (emphasis added).

[27] *See Graham v. Today's Spirit*, 468 A.2d 454, 457 (Pa. 1983).

[28] *Moses v. McWiliams*, 549 A.2d 950, 960 (Pa. Super. Ct. 1988).

Here, plaintiffs' amended complaint failed to identify to whom the defamatory statements were made.[29] However, it did identify four allegedly defamatory statements made by defendants.[30]

Setting aside that the failure to identify to whom those statements were made should be fatal to plaintiffs' defamation claim, this court will, at the least, limit plaintiffs' recovery to those four statements. As such, the exclusion of any other witness—whose purpose was to present evidence of a statement not pled in the complaint—was harmless error.

B. This Court Properly Applied the Judicial Privilege to Preclude Liability for Statements Made During the Course of Judicial Proceedings

During the course of the investigation into Cavoto, Rosenau allegedly made defamatory statements about Cavoto to personal injury attorneys who had clients being treated by Cavoto. However, because the statements took place during the course of judicial proceedings about matters pertinent and material to those proceedings, the judicial privilege bars them from being admitted to support a claim for defamation.

The judicial privilege prohibits the statement of any victim, witness, judge, or attorney— which is issued in the course of a judicial proceeding, and which is even minimally pertinent and material to the redress sought in that proceeding—from being introduced into evidence in a later suit for defamation.[31]

---

[29] Compl. ¶ 66.

[30] *Id.* (The alleged defamatory statements were that: 1) plaintiff is "dirty" and "under investigation"; 2) "State Farm is bringing a RICO action" against plaintiff; 3) Plaintiff is "real bad news"; and 4) others should "stay away from [plaintiff]").

[31] *Richmond,* 35 A.3d 779, 784 (Pa. Super. Ct. 2012); *see also Feirerstein,* 2017 WL 712911 at *3 ("Courts have continually protected a variety of communications made at various proceedings as well as *statements with only minor relation to the underlying case.")* (emphasis added).

8

The privilege exists in order to promote freedom of access to the courts.[32] As such, the scope of the privilege is very broad and encompasses *all* communications made during the course of *any* stage of a judicial proceeding.[33] This includes "even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest."[34]

Furthermore, the privilege cannot be destroyed by abuse, and there is a presumption that it applies. As noted by the Pennsylvania Superior Court, "the existence of the privilege does not depend upon the motive of the declarant in making the alleged defamatory statement. The privilege is absolute and cannot be destroyed by abuse."[35] Additionally, "All doubt as to whether the alleged defamatory communication was indeed pertinent and material to the relief or redress sought is to be resolved in favor of pertinency and materiality."[36] Therefore, any communication, issued in the course of a judicial proceeding, that is even minimally pertinent and material to that proceeding, is afforded immunity—no matter the declarant's motive.[37]

This does not, however, leave a defamed party without protection. A court of law is still able to issue discipline for defamatory statements—such as issuing sanctions or holding the declarant in contempt.[38]

Plaintiffs present three reasons why this court erred in applying the judicial privilege. First, plaintiffs claim this court failed to take into consideration the intent of the declarant in assessing whether the statement was pertinent and material to litigation.[39] Second, plaintiffs

---

[32] *Ricmond*, 35 A.3d at 784.
[33] *Id.*
[34] *Id.* at 785.
[35] *Id.* at 784-85.
[36] *Id.* at 785.
[37] *Id.* at 784-85.
[38] *Id.* at 784.
[39] Pl. Post-Trial Memo, **36-37.

9

claim this court incorrectly determined that the excluded statements were pertinent and material to litigation.[40] Third, that this court applied the privilege in circumstances where the safeguards of the judicial process were not present.[41]

This court finds: (1) the intent of the declarant is not relevant if proceedings have commenced; (2) all the statements complained of were pertinent and material to their underlying litigation; and (3) the judicial safeguards were present. Therefore, the judicial privilege was properly applied to bar many of plaintiffs' witnesses.

1. The intent of the declarant is not assessed when the statement is made during the course of ongoing judicial proceedings

Plaintiffs' claim, when looking at the totality of the circumstances, is that State Farm's true intent was to put Cavoto out of business rather than to pursue any redress sought in litigation.[42] To support that position, they argue that there was a pattern of acts and "hardball litigation" tactics, taken over the course of several different lawsuits, showing State Farm's true intent was to put him out of business.[43]

Nevertheless, the "true intent" of the declarant is not relevant if litigation has been commenced.[44] After a lawsuit has been filed, the privilege is defeated only upon a determination that: (1) the attorney's communication was not pertinent or material to the redress sought in the litigation; or (2) the normal safeguards of the judicial process are not present.[45]

---

[40] Pl. Post-Trial Memo, **38-40.

[41] Pl. Post-Trial Memo, **40-44.

[42] Pl. Post-Trial Memo, *37.

[43] *Id.*

[44] *See Richmond*, 35 A.3d at 784-85 ("The existence of the privilege *does not depend on the motive of the defendant* in making the allegedly defamatory statement. The privilege is absolute and *cannot be destroyed by abuse*.") (emphasis added).

[45] See *Post*, 507 A.2d 351 (finding letter accusing opposing counsel of misconduct was not privileged because it was sent to persons unrelated to the pending litigation, including the Disciplinary Board, and was therefore not pertinent to the relief sought in the litigation); *See Preiser v. Rosenzweig*, 646 A.2d 1166, 1168 (Pa. 1994) (holding statements before a private "fee dispute" panel were not privileged due to panel's lack of ability to punish defamatory statements).

10

Even the most egregious and insulting comments made by an attorney are privileged as long as they are even minimally pertinent and material to the relief sought in pending litigation.[46] In *Richmond v. McHale*, the defendant, an attorney, was sued for statements he made about an opposing counsel in a sexual assault lawsuit.[47] The defendant had accused the plaintiff of extortion while at a discovery meeting.[48] In the subsequent defamation lawsuit, the defendant asserted the judicial privilege to successfully bar introduction of that accusation, despite its egregious nature. The court found the privilege applied because the statement was pertinent and material to the underlying litigation, and specifically noted: "the existence of the privilege *does not depend upon the motive of the defendant* in making the alleged defamatory statement. The privilege is absolute and *cannot be destroyed by abuse*."[49]

The intent of the declarant is only relevant when the statement is made prior to litigation. In that situation, courts determine whether the declarant intended that litigation would follow the statement. If so, and the statement is pertinent and material to that contemplated litigation, then the statement is protected by the judicial privilege.[50] In *Schanne v. Addis*, a teacher sued a former student over the student's claim that the teacher had assaulted her.[51] The student made the claim to a friend at Thanksgiving—seven years after the alleged assault.[52] The Pennsylvania Supreme Court found the privilege did not apply because no judicial proceedings had commenced, and the student had not made the statement with the intention that litigation would

---

[46] *See Richmond*, 35 A.3d 779; *also Feierstein*, 2017 WL 712911 at *3.
[47] *Id.* at 781.
[48] *Id.*
[49] *Id.* at 784-85 (emphasis added).
[50] *See Schanne v. Addis*, 121 A.3d 942 (Pa. 2015).
[51] *Id.* at 944.
[52] *Id.* at 943.

follow.[53] Instead, the student believed she was confiding in a "friend", and she "did not intend" for the friend to report it to anyone else.[54]

Here, only one witness, Bendo, spoke with Rosenau prior to the commencement of litigation, and in assessing whether the privilege applied, this court analyzed Rosenau's intent at the time he made the statement.[55]

In or around 2004, Rosenau and Bendo were opposing counsel in a car accident lawsuit involving a State Farm insured, Shannon O'Neill ("O'Neill").[56] O'Neill had collided with a vehicle that was carrying two passengers—Jerome Baker ("Baker") and Robert Jones ("Jones")—who were being represented by Bendo's lawfirm.[57]

Initially, Bendo filed a lawsuit against O'Neill on behalf of Jones, but not Baker.[58] Prior to filing the Baker lawsuit, but after commencement of the Jones suit, Rosenau and Bendo engaged in two phone calls in which Rosenau made comments about Cavoto—the treating chiropractor of both Jones and Baker.[59]

---

[53] *Id.* at 952.
[54] *Id.* at 943-44.
[55] Within this section, plaintiff identifies defendants' statements to Clark Pease, Esquire, Robert Datner, Esquire, Lawrence DeMarco, Esquire, Fred Horn, Esquire, and Warren Siegel, Esquire, as situations that, when taken together, demonstrate defendants' intent was to injure Cavoto's reputation. However, all of those statements took place during the course of ongoing litigation. *See* Def. Post-Trial, Ex. Q, *39 (Pease conversation was within a deposition); *Id.* Ex. R, **7-8 (Datner conversation was within a deposition); *Id.* Ex. U, *77 (DeMarco conversation was within a settlement discussion); *Id.* Ex. V, **34-5 (Horn conversation occurred after an insurance claim had been filed); *Id.* Ex. X (Siegel could not recall when or who made the statements, but believed they were made at an arbitration hearing). Furthermore, aside from the testimony of these witnesses being excluded based on the judicial privilege, this court also found their recollections to be extremely imprecise and would have excluded their testimony based on lack of personal knowledge.
[56] Record, 11/2/2016, *216, 4-17.
[57] *Id.* at *218, 21 - *219, 5.
[58] *Id.* at *217, 22 - *218, 6.
[59] Record, 10/31/2016, *108, 4.

12

The first conversation was commenced by Rosenau,[60] and was for the purpose of speaking about the Baker lawsuit,[61] which had not yet been filed.[62] During the conversation, Bendo asked if Rosenau would accept service of process,[63] and Rosenau informed Bendo that there would be no settlement offers in the case.[64] When Bendo asked why, Rosenau replied, "you may have a problem with your doctor"—referring to Cavoto.[65] Rosenau allegedly went on to call Cavoto "bad news" and a "dirty doctor", and stated that he was under investigation.[66] He further likened Cavoto to Dr. Matura—a doctor who had been indicted for fraud.[67]

Bendo felt these comments were unusual and inappropriate.[68] He testified that it is natural for a defense attorney to ask questions about the treating doctor and to make statements about the doctor's lack of qualifications, but that equating a doctor with someone who had been indicted for fraud is "something different."[69]

Nevertheless, despite Bendo's belief that the statements were inappropriate, they were pertinent and material to the Baker litigation that Rosenau intended would follow. Rosenau initiated the conversation with the intent of discussing litigation that did occur. After all, the *Jones* case—which arose from the same accident—was already in litigation, Bendo was seeking to have Rosenau accept service of the Baker complaint, and Rosenau had taken the stance that no settlement offers would be made. Therefore, absent Baker deciding not to file the lawsuit or later choosing not to pursue it, litigation was bound to ensue.

---

[60] *Id.* at *109, 10-12.
[61] *Id.* at *112, 18-19.
[62] *Id.* at *111, 14-16.
[63] *Id.* at *112, 19-22.
[64] *Id.* at *113, 19-21.
[65] *Id.* at *113, 21-24.
[66] *Id.* at *114, 12-21.
[67] *Id.*
[68] *Id.* at 115, 4-10.
[69] *Id.* at *115, 11 - *116, 8.

The statements were also pertinent and material to the redress that Rosenau would be seeking in the *Baker* lawsuit. A treating doctor's credibility is at issue in a personal injury lawsuit. Even in *Richmond*—where the statement was a personal attack on opposing counsel and arguably minimally related to the litigation—the privilege applied. Thus, Rosenau's statements about Cavoto were pertinent and material to contemplated litigation and properly excluded based on the judicial privilege.

Conversely, in the second conversation, Rosenau's statements were not pertinent and material to any litigation he intended would follow. Instead, Rosenau intended to give Bendo advice on how to handle future clients referred by Cavoto—who may not have a claim against a State Farm insured.[70]

The second conversation was initiated by Bendo and was for the purpose of asking Rosenau for advice.[71] Specifically, Bendo asked,

> "[L]ook, what you told me has upset me because I have cases with [Cavoto]. A decent amount of my clients are treating at his offices. This affects me. What's going on? . . . Give me the advice I need as to what's going on so I can make the right decision."[72]

In response, Rosenau advised Bendo not to send any future clients to Cavoto for treatment or accept client referrals from him.[73]

By giving advice on how to handle future cases, which may never arise, Rosenau was not speaking about matters pertinent to contemplated litigation. Further, it is likely that, from that point forward, at least one case referred by Cavoto would not have involved a claim against a State Farm insured; thus, Rosenau was not even representing a client's interest. Therefore, the

---

[70] *Id.* at *119, 6-13.
[71] *Id.* at *118, 21-25.
[72] *Id.* at *118, 6-14.
[73] *Id.* at *119, 6-13.

14

judicial privilege did not apply to shield Rosenau from liability for the statements he made in that second conversation.

This court will not extend the "intent" inquiry to statements made during the course of litigation. The law is clear that the privilege is absolute and cannot be destroyed by abuse. Rosenau's motive or intent in making a statement is irrelevant when it is made during the course of litigation. Aside from the Bendo conversations, all of Rosenau's alleged defamatory statements took place during the course of litigation.[74] Therefore, as long as they were pertinent and material to the ongoing litigation, they were properly barred by the judicial privilege.

2. The excluded statements were pertinent and material to the relief sought in the underlying lawsuit.

Consequently, plaintiffs' second argument is that this court erred in determining that defendants' statements were pertinent and material to ongoing litigation. Under this theory, plaintiffs contend the statements made to Bendo and Larry DeMarco, Esquire ("DeMarco"), as well as evidence of State Farm's "shadow discovery" methods were improperly excluded.[75]

Here, all of defendants' alleged defamatory conduct and statements occurred during litigation involving a plaintiff being treated at one of Cavoto's offices. As such, questions and statements about Cavoto would likely be pertinent and material to the litigation.

Having already discussed the pertinence of Rosenau's statements to Bendo, this section will address plaintiffs' arguments regarding DeMarco and State Farm's "shadow discovery" tactics.

---

[74] *See infra* FN 55.
[75] Pl. Post-Trial Memo, **38-9.

15

*a. A statement suggesting a treating doctor's lack of credibility in a personal injury lawsuit is pertinent and material to the litigation.*

Prior to trial, this court excluded the testimony of DeMarco on the filing of a joint motion by defendants.[76] From a review of DeMarco's deposition, this court concluded his testimony was unreliable and barred by the judicial privilege.

Plaintiffs sought to have DeMarco testify about a settlement conversation he had with Doug Babin ("Babin")—an SIU investigator for State Farm.[77] DeMarco, however, could not recall any specific statements made by Babin. Instead, he could only state he got the impression Babin found Cavoto lacked credibility and that State Farm would not "pay a dime" to any claim that came out of Cavoto's office.[78]

Although DeMarco could not recall Babin's statements, he did recall that it occurred while they "were negotiating a claim."[79] In that claim, DeMarco's injured client had been treated at one of Cavoto's offices.[80]

At the time, defendants were suspicious of the veracity of any injury being treated by plaintiffs because they were suspicious of plaintiffs' solicitation practices. As a result, State Farm apparently took a stance that they would not negotiate any claim involving Cavoto as the treating chiropractor.

---

[76] *See* October 17, 2016 Order, Cntl. # 16093534.

[77] Pl. Post-Trial Memo, *39.

[78] DeMarco, Def. Ex. U, at * 89, 12-20.

[79] *Id.* at *77, 8-14.

[80] *Id.* at * 89, 13.

16

Assuming, *arguendo*, that State Farm had that policy, there is nothing improper about it. Parties cannot be compelled to consider settlement or even make a reasonable settlement offer. Furthermore, public policy encourages insurance companies to investigate insurance fraud.[81]

Nevertheless, Babin's alleged statement—that State Farm would not negotiate a claim involving Cavoto—occurred during litigation involving Cavoto; therefore, it was pertinent and material to that litigation.

> b. *Whether an injured plaintiff sought treatment or was solicited for treatment is pertinent in a personal injury lawsuit*

Throughout this litigation, plaintiffs have argued that State Farm and Rosenau used depositions in litigation unrelated to Cavoto to gain information on him and his business practices—conduct they refer to as "shadow discovery". In their post-trial memorandum, plaintiffs argue this court erred by not analyzing each instance of "shadow discovery" separately, yet only cite the deposition of Dr. Stephen Vernille ("Vernille")—a chiropractor in one of the plaintiff offices—in the case of *Wade v. Holloway* as an example of State Farm's "shadow discovery" tactics.[82]

Through an extensive review of that deposition, this court found that Rosenau never mentioned Cavoto's name. Instead, the only arguable relation to Cavoto was Rosenau's questions about Fisher and Fishbone Advertising ("Fishbone")—the telemarketing/advertising agency created and used by Cavoto to solicit clientele.[83]

---

[81] *See Forster*, 189 A.2d at 150 (finding conditional privilege existed immunizing insurance company from invasion of privacy liability for following and documenting movements of an injured claimant because "it is in the best interests of society that valid claims be ascertained and fabricated claims be exposed.")

[82] Pl. Post-Trial Memo, *39-40.

[83] Def. Post-Trial Memo, Ex. AA, *49, 5-9.

In his deposition, Vernille stated he used a variety of marketing tools to gain clientele, included telemarketing.[84] In seeking information about the telemarketing agencies he used, Rosenau asked Vernille if he knew of Fisher or Fishbone—to which Vernille indicated he did not.[85]

There is nothing improper about those two questions, and further, their link to Cavoto is attenuated at best.[86] At that time, Rosenau had knowledge (or at least suspicions) that Fishbone solicited accident victims via police records, and Rosenau sought to determine if that was how the plaintiff came to be treated by Vernille. This is relevant because a plaintiff who is solicited for treatment is likely less injured than a plaintiff who seeks treatment on her own.

It is also worth noting that Rosenau also asked if Vernille knew of Medical Connection— a different telemarking company—and its owner Gina Batalinni.[87] Thus, taking the deposition as a whole, this court finds Rosenau was simply representing his client's interests by determining how the plaintiff sought treatment—a fact pertinent and material to the *Wade v. Holloway* litigation.

Therefore, the "shadow discovery" tactics were properly excluded.

3. The Safeguards of the Judicial Process Were Present

Lastly, plaintiffs argue this court should not have excluded any witness based on the judicial privilege because judicial safeguards to protect against misconduct were not present.[88]

---

[84] *Id.* at *46, 22-23.
[85] *Id.* at *49, 5-9.
[86] It should be noted that because Dr. Vernille was unaware who Marge Fisher was, he was unable to link the question about her to Cavoto. Therefore, Dr. Vernille's testimony could not have been used to establish a claim of defamation, since the recipient of the statement must understand its defamatory meaning and its application to the plaintiff.
[87] *Id.* at *78, 8-12.
[88] Pl. Post-Trial Memo, *40.

A statement does not need to be issued in open court for the judicial privilege to apply. As noted in *Richmond*, the privilege encompasses less formal communications such as "correspondence between counsel in furtherance of the client's interest" and "statements made by counsel in preliminary negotiations on their client's behalf."[89]

Nevertheless, part of the policy behind the privilege is that a court is able to issue its own discipline for defamatory statements when they are issued during the course of litigation.[90] Therefore, plaintiffs correctly argue that judicial safeguards must be present for the privilege to apply; however, they incorrectly argue that those safeguards were not present in the cases where Rosenau allegedly made defamatory statements.

Plaintiffs attempt to liken this case to *Preiser v. Rosenweig*;[91] however, their reliance upon *Preiser* is misplaced. In *Preiser*, the Pennsylvania Supreme Court held a Pennsylvania attorney's statements about an out of state attorney—contained within a complaint submitted to an Allegheny county fee dispute committee—were not protected by the judicial privilege.[92]

The Court reasoned the statements were not privileged because of the private nature of the fee determination committee.[93] As a private committee, its decisions "could only affect those who consented to it," and the out of state attorney had not consented to the committee's authority.[94] Therefore, the out of state attorney did not have the ability to invoke the committee's power to issue discipline for the Pennsylvania attorney's defamatory statements; and so, because judicial safeguards were not present, the privilege did not apply.[95]

---

[89] *Richmond*, 35 A.3d at 785.
[90] *Id.* at 784.
[91] Pl. Post-Trial Memo, *41.
[92] *See Preiser*, 646 A.2d 1166 (Pa. 1994).
[93] *Id.* at 1169.
[94] *Id.* at 1169-70.
[95] *Id.* at 1170.

Here, the situation is unlike *Preiser*. With the exception of Rosenau's statements to Bendo, which were submitted to the jury, each alleged defamatory statement occurred within the context of an ongoing public judicial proceeding.[96] Unlike the private fee determination committee, a court of law has the ability to impose punishment for a defamatory statement regardless of whether the party consented to its authority.

Further, as defendants noted in their post-trial memorandum, plaintiffs took advantage of judicial safeguards in the case of *Ray v. Carter*.[97] In that case, Rosenau subpoenaed Fisher in order to determine whether Fishbone had solicited the plaintiff to seek treatment.[98] In response to the subpoena, Cavoto's attorney at the time, Robert Dickman, Esquire ("Dickman"), petitioned the court for a protective order to prevent Fisher from being forced to identify her relationship with Cavoto.[99] Although the petition was unsuccessful, plaintiffs were able to utilize existing judicial safeguards to challenge defendants' actions in front of a learned judge.

Just as the judicial safeguards were available for plaintiffs to challenge defendants' actions in that case, they were also present in each case where an arguably defamatory statement was made. Therefore, the judicial privilege was properly applied.

C. This Court's Ruling on the Admissibility of the Dickman Letter Was Proper

At the forefront of plaintiffs' claims of error is this court's ruling on the partial admissibility of the March 26, 2004, letter authored by Dickman and addressed to Patrick McCoyd, Esquire ("McCoyd") (letter hereinafter referred to as "the Dickman letter" or "letter").[100] At the time, Dickman was representing Cavoto in litigation against defendants for

[96] *See infra* FN 55.
[97] *See* Def. Post-Trial Memo, Ex. B; *also Id.* at Ex. CC.
[98] *See Id.* Ex. B, *3, 19-24.
[99] *Id.* at *5, 6-25.
[100] Pl. Post-Trial Memo, *24.

abuse of process,[101] and sought to warn McCoyd that his client, Rosenau, had made improper statements to Bendo about Cavoto.[102]

Defendants introduced the Dickman letter during their examination of Rosenau, and following plaintiffs' objection, this court allowed the date of the letter to be introduced.[103] Both parties were also permitted to ask Rosenau questions about what information was (and was not) contained in the letter in order to establish its context for the jury.

Plaintiffs argue that ruling was error on the grounds that the letter was not authenticated, was hearsay, and unduly prejudicial to plaintiff's case. For the reasons that follow, this court finds: (1) plaintiffs waived an objection to the letter's authenticity; (2) its ruling did not violate the rules against hearsay; and (3) the letter was highly relevant in proving plaintiffs failed to file their lawsuit within the statute of limitations.

1. Plaintiffs failed to preserve an objection to the Dickman Letter's authenticity

In their post-trial motion, plaintiffs contend that allowing testimony of the Dickman letter was error because it was not properly authenticated.[104] However, because this issue was never raised prior to post-trial motions, it is deemed waived, and this court cannot address its merits.

A court may not grant post-trial relief for a claim of error unless the error was raised in pre-trial proceedings or by timely objection at trial.[105] Unless it is apparent from the context of the objection, the party must state the grounds for the objection.[106] Requiring a timely and

---

[101] Record, 11/2/2016, *220, 23-25.
[102] *See* Def. Post-Trial Memo, Ex. L.
[103] Record, 11/2/2016, *223, 2-25.
[104] Pl. Post-Trial Memo, *25.
[105] Pa.R.C.P. 227.1(b)(1) (". . .post-trial relief may not be granted unless the grounds therefor, (1) if then available, were raised In pre-trial proceedings or by motion. . .offer of proof or other appropriate method at trial;").
[106] Pa.R.E. 103(a)(1)(B).

21

specific objection permits the trial court to correct errors at the time they occur.[107] Therefore, any error not timely and specifically raised is deemed waived.

Here, it was not clear from plaintiffs' objection that it was based on authenticity. The subsequent sidebar argument was focused on hearsay,[108] and when defense counsel laid foundation for the letter's authenticity, plaintiffs' counsel remained silent.[109]

It is also worth noting that plaintiffs did not raise an objection to the letter prior to trial, despite its admissibility being ripe for determination. Although pre-trial motions are not compulsory, the parties submitted *forty-five* motions in limine—none of which concerned this letter. Additionally, plaintiffs relied upon this exact letter in its memorandum of law opposing summary judgment,[110] and referenced other letters authored by Dickman in its opening statement with no apparent concern for their authenticity.[111]

Therefore, this court finds plaintiffs failed to properly preserve an objection to the Dickman letter's authenticity, and this court is unable to adequately address the claim of error.

---

[107] *Dilliplaine v. Lehigh Valley Trust Co.*, 322 A.2d 114, 116 (Pa. 1974).

[108] The following is an excerpt of the trial transcript at the time of plaintiff's objection to the Dickman letter. The letter was introduced by State Farm counsel during its examination of Rosenau.

> Q: And did Mr. Dickman write you and your attorney letters?
> A: Yes.
> Q: I'm going to hand you what's marked D-88. May I approach your Honor?
> Mr. Seglias: Objection.
> (Sidebar as follows:)
> Mr. Holland: This has been introduced for the purpose of the timing of the letter, which is pertinent to the statute of limitations. This is also from Dr. Cavoto's attorney. It's an admission of a party opponent.
> Mr. Seglias: Not a party.

Lee Rosenau, at *221, 3-18.

[109]
> Mr. Holland: This is a letter from Dr. Cavoto's attorney, Mr. Dickman, summarizing or purporting to summarize the conversation you had with Mr. Bendo?
> Mr. Rosenau: It is.

*Id.* at *223, 7-11.

[110] *See* Pl. Memo. Opp. S.J., at *26-27.

[111] Record, 10/31/2016, at *42, 9-11 ("Mr. Dickman followed up that conversation with a letter that same day to Mr. Rosenau..."); *Id.* at *43, 25 - *44, 4 ("[Mr. Dickman] followed that up with another letter, April 14th, and said, we made an offer, haven't heard from you. You're welcome to come in.")

2. The letter's date was properly admitted as an opposing party's statement.

While plaintiffs failed to preserve an objection to the letter's authenticity, the objection of hearsay was clearly raised at the time of trial. Nevertheless, the exception to the rule against hearsay for an opposing party's statement applied to allow the elicited testimony.

Hearsay is an out of court statement, which is being introduced to prove the information contained within it is true.[112] Hearsay is inadmissible at trial unless an exception applies.[113] A statement made by a party opponent is one of the exceptions to the rule against hearsay.[114] Under the exception, a "party's statement" includes statements made "by the party's agent or employee on a matter within the scope of that relationship."[115]

In order to impute an agent's statement to a party, the proponent must establish: "(1) the declarant was an agent or employee of the party opponent; (2) the declarant made the statement while employed by the principal; and (3) the statement concerned a matter within the scope of the agency of employment."[116] With respect to the third requirement, specific authorization to speak need not be shown, but the statement must "concern a subject matter within the declarant's scope of employment or agency."[117]

Here, at the time he wrote the letter, Dickman was acting as Cavoto's attorney. Plaintiffs recognize, and in fact argue, that an attorney is an agent of his or her client.[118] Thus, as long as Dickman was speaking on a subject matter within the scope of his agency, the letter was admissible as an opposing party's statement.

---

[112] Pa.R.E. 801.
[113] Pa.R.E. 802.
[114] Pa.R.E. 803(25).
[115] Pa.R.E. 803(25)(D).
[116] *Sehl v. Vista Linen Rental Serv. Inc.*, 763 A.2d 858, 862 (Pa. Super Ct. 2000).
[117] *Id.*
[118] Pl. Post-Trial Memo, *52; *See also Weiner v. Lee*, 669 A.2d 424 (Pa. Commw. Ct. 1995) (finding "an attorney serves an an agent of his or her client and any acts performed and statements made by the attorney within the scope of his or her employment and authority are binding upon the client.").

23

At the time the letter was written, Dickman was representing Cavoto in a lawsuit against Rosenau and State Farm for abuse of process. The purpose of the letter was to warn McCoyd of Rosenau's alleged defamatory statements, and specifically asked, "Does your client really want more lawsuits?"[119] As Cavoto's representative in ongoing litigation, Dickman was at least impliedly authorized to speak on this subject matter since it related to the ongoing litigation.

Nonetheless, evidence was even presented suggesting that Cavoto explicitly directed Dickman to write the letter. At trial, Bendo confirmed that he has never met or spoken with Dickman[120] —which indicates Dickman could not have learned of Rosenau's statements from Bendo. Bendo did, however, report the statements to Cavoto.[121] Thus, the logical conclusion is that, Cavoto complained to Dickman after being told of Rosenau's statements, and Dickman subsequently wrote a letter to Rosenau's attorney.

Therefore, this court finds Dickman was acting within the scope of his agency, and the entire letter, including its date, was admissible to prove its truth. The truth of the matter asserted in the letter is that Dickman *was told* Rosenau had made disparaging statements about Cavoto in a conversation with Bendo.

However, the letter also contained inadmissible hearsay. The letter contained "quotes" of the statements apparently attributable to Rosenau—which were hearsay without an exception. As such, the jury was not permitted to take those "quotes" as evidence Rosenau had actually delivered those statements.

This court determined the risk the jury would take those quotes as true was high, so the court allowed only limited testimony of the letter. The ruling allowed the date of the letter to be

---

[119] *See* Def. Post-Trial Memo, Ex. L.
[120] Record, 10/31/2016, at *154, 18-19.
[121] *Id.* at *155, 17-24.

24

admitted into evidence and granted both parties leeway in their questions so that context for the letter's date could be established. For example, the court permitted defense counsel to ask the following question:

> "MR. HOLLAND: This is a letter from Dr. Cavoto's attorney, Mr. Dickman, summarizing or purporting to summarize the conversation you had with Mr. Bendo?
>
> MR. ROSENAU: It is."[122]

And on re-direct, plaintiffs' counsel was permitted to ask whether the letter contained any information about Dr. Matura—a central focus of the defamatory conversation recounted by Bendo—in an apparent attempt to argue the letter did not describe the same conversation.[123]

Plaintiffs argue that allowing this context was improper, as it was describing hearsay.[124] Conversely, defendants argue the court's ruling was proper because the testimony was not being introduced for its truth, but rather, as an "operative fact."[125]

However, as discussed above, the letter was an opposing party's statement, which could have been admitted in its entirety to establish Dickman had been told of Rosenau's statements—or in other words, to establish plaintiffs had knowledge of defendants' defamation more than one year from the date this lawsuit was filed.

Therefore, this court decided the best way to balance the danger the jury would take the "quotes" of Rosenau in the letter as true, and defendants' strong interest in establishing a statute of limitations defense, was to allow the parties to characterize what the letter purported to

---

[122] Record, 11/2/2016, *223, 7-11.

[123] *Id.* at **229, 1 – 232, 9.

[124] Interestingly, plaintiffs requested the Dickman letter be produced to the jury, after the jury requested to inspect it during deliberations, with no apparent concern for its hearsay or that it hadn't been introduced into evidence.

[125] Defendants do not cite any authority discussing the definition of an "operative fact."

describe through limited questioning, permit testimony about its date, and deny the request to admit the letter into evidence.

3. The letter was highly relevant in ascertaining whether plaintiffs complied with the statute of limitations.

Seeming to rely on the proposition that counsel's characterization of the Dickman letter's contents was improper, plaintiffs argue the letter should have been excluded as irrelevant.[126]

For a document to be relevant, it must simply make any element of a claim or defense more or less probable.[127]

Having established that characterizing the letter's contents was proper, the relevance of the document is established. Plaintiffs knowledge of Rosenau's alleged defamatory statements as early as March 2004, made it more probable that Cavoto's lawsuit—which was filed in June 2005—was barred by the one-year statute of limitations. Thus, plaintiffs' objection to the Dickman letter's relevance similarly fails.

4. This court's responses to the questions submitted by the jury during its deliberations were proper.

During deliberations, the jury submitted a series of questions to the court. Plaintiffs claim this court erred in its responses to two of the questions.[128] First, the jury requested to see the Dickman letter—which this court denied.[129] Second, the jury asked for the following portion of Rosenau's testimony to be read back—which this court allowed.

> "MR. HOLLAND: This is a letter from Dr. Cavoto's attorney, Mr.
> Dickman, summarizing or purporting to summarize the
> conversation you had with Mr. Bendo?
> MR. ROSENAU: It is."[130]

---

126 Pl. Post-Trial Memo, *27.
127 Pa.R.E. 402.
128 Pl. Post-Trial Memo, *29.
129 Record, 11/8/2016, *122, 3-9.
130 Record, 11/2/2016, *223, 7-11.

Without citing to any authority, plaintiffs argue it was an abuse of discretion to deny the jury's request to see the letter[131] and to allow Rosenau's testimony to be read back to the jury.[132]

It is within the discretion of a trial judge to permit or deny "specified testimony to be read back to the jury upon the jury upon the jury's request" or "make exhibits available to the jury during its deliberations."[133]

First, as explained *infra*, only the date of the Dickman letter was introduced into evidence. The letter itself was not received as an exhibit. Therefore, this court lacked authority to have it produced to the jury pursuant to Pa.R.C.P. 223.1(d)(3).

Plaintiffs next claim that allowing testimony about what the letter purported to summarize was improperly misleading because there was "no evidence that the document reflected the conversation(s) in question."[134] However, no party sought to argue the letter accurately described the conversations Bendo testifying to having. Defense counsel's question was whether the letter "purported" to summarize the conversation.[135] Use of the word "purport" indicates defendants' belief the letter was appearing to—but did not actually—summarize a conversation between Rosenau and Bendo. Furthermore, plaintiffs fail to cite any authority suggesting that allowing the testimony to be read back to the jury was an abuse of discretion.

Simply, it was in this court's sound discretion to decide what testimony and evidence could be produced to the jury during deliberations, and absent a showing of clear and convincing evidence that it abused its discretion, this court finds its answers to the jury's inquires were proper.

---

[131] Curiously, plaintiffs were no longer concerned with the letter's hearsay or authenticity.
[132] Pl. Post-Trial Memo, **29-30.
[133] Pa.R.C.P. 223.1(d)(1)(3).
[134] Pl. Post-Trial Memo, *29.
[135] Record, 11/2/2016, *223, 7-10.

## V. Testimony About Rosenau's 2004 Billing Records was Proper.

Rosenau testified he believes the conversations with Bendo took place in March 2004 because he reviewed his 2004 billing records prior to trial, and they indicated he had a series of conversations with Bendo in March 2004.[136]

Plaintiffs claim it was error to allow this testimony because Rosenau's billing records are hearsay and were never produced in discovery.[137] This court finds the testimony was appropriate because: 1) Rosenau used the billing records to properly refresh his recollection before trial; and 2) in discovery, State Farm offered documentation which would have informed plaintiffs that the Rosenau-Bendo conversations took place in March 2004, and plaintiffs refused the documents.

### A. Rosenau properly refreshed his recollection with the billing records before trial.

Pursuant to Pa.R.E. 612(a), a witness may, either prior to or while testifying, use any writing or item to refresh his or her recollection of an event.[138] If a party refreshes his recollection at the time of trial, the adverse party is "entitled" to have the writing produced; however, if a witness refreshes his recollection prior to testifying, it is in the court's discretion to determine whether "it is necessary in the interests of justice" to order production of the writing.[139]

Rosenau refreshed his recollection with his billing records prior to trial.[140] Thus, production of the billing records was not mandatory, and this court determined that production was not necessary because: 1) there was no indicia that they were unreliable; 2) plaintiffs were

---

[136] Record, 11/2/2016, *216, 24 - *217, 3.
[137] Pl. Post-Trial Memo, *30-31.
[138] See Pa.R.E. 612(a).
[139] Id. (b)(1)-(2).
[140] Record, 11/2/2016, *20-23.

28

permitted to cross-examine Rosenau on his failure to produce them; and 3) plaintiffs were permitted to argue that the failure to produce them suggested Rosenau was lying.[141]

Therefore, Rosenau properly refreshed his recollection prior to trial with his billing records, and the testimony was appropriate.

B. An adverse inference instruction would have been inappropriate because defendants were able to satisfactorily explain their failure to produce the billing records.

Plaintiffs also objected to testimony of the billing records because they were never produced prior to trial.[142] Plaintiffs argue an adverse inference jury instruction should have been given.[143]

An adverse inference instruction allows a fact-finder to conclude that evidence, which was in a party's control and that was not produced prior to trial, was detrimental to that party's case. An adverse inference instruction is not mandatory, but rather, it is permissive.[144] In order for the instruction to be awarded, three requirements must be met: 1) the evidence was within the control of one party in the lawsuit, 2) the evidence would be relevant and helpful to that party, and 3) the party does not satisfactorily explain why the evidence was not produced at trial.[145]

Here, plaintiffs' claim of error fails on the third requirement. During a discussion in chambers, defendants explained that they offered to produce the entire State Farm *Jerome Baker* case-file."[146] However, plaintiffs rejected that offer and objected to information from the file being introduced at trial.[147] This is relevant because, as mentioned above, the *Jerome Baker* case

[141] Record, 11/8/2016, *28, 18 - *29, 15.
[142] Record, 11/2/2016, *217, 4-7.
[143] Pl. Post-Trial Memo, *31-32.
[144] *See Kovach v. Solomon*, 732 A.2d 1, 8 (Pa. Super Ct. 1999) (finding a fact finder *may* be permitted to draw an adverse inference due to a party's failure to produce evidence within his or her control).
[145] PA Standard Jury Instruction § 5.30.
[146] Record, 11/3/2016, *9, 14-25; *see also* Def. Post-Trial Memo, Exhibit N (containing correspondence between counsel regarding the Jerome Baker case-file.)
[147] *Id.*

led to the Rosenau-Bendo conversations.[148] If plaintiffs had accepted defendants offer, plaintiffs would have discovered the conversations took place prior to June 2004, just as Rosenau discovered from reviewing his billing records from the cases.

Furthermore, it is likely Rosenau's billing records contained confidential attorney-client information.[149] Thus, because the records may have been privileged and defendants provided plaintiffs with the opportunity to discover the same information through different means, this court finds defendants satisfactorily explained why the evidence was not produced at trial. Therefore, it was not error to admit the testimony or deny plaintiffs' request for an adverse inference jury instruction.

## VI. Excluding Evidence of Defendants' Actions Taken After the Filing of this Lawsuit was Proper.

Plaintiffs claim they should have been permitted to enter evidence of actions taken by defendants after this lawsuit was filed.[150] More specifically, plaintiffs sought to introduce the testimony of John Smith, Esquire ("Smith") to establish damages,[151] and State Farm's "Midtown Memo".[152] This court excluded such evidence because Smith's testimony was barred by the judicial privilege, and introduction of the "Midtown Memo" would have been unduly prejudicial.

### A. Litigation, alone, cannot be the basis of a claim for a defamation or tortious interference claim.

Smith stopped referring clients to Cavoto in or around 2011 after he became aware of legal disputes between Cavoto and State Farm.[153] This was because Smith had a policy of

---

[148] Record, 11/2/2016, *216, 13-25.
[149] Def. Post-Trial Memo, *22.
[150] Pl. Post-Trial Memo, *47.
[151] Id. at *48.
[152] Id. at *47.
[153] Def. Post-Trial Memo, Ex. JJ, *42-43.

avoiding any doctor who was involved in litigation or who was being investigated by an insurance company.

> "When the doctor is under investigation or under federal litigation or litigation by an entity such as State Farm, it calls into credibility, especially as it's pending, whether or not there's something there. There may be something there. So if it was *any* insurance company, I would not refer a client to a doctor who is being investigated."[154]

Smith stopped referring clients to Cavoto simply because Cavoto was in the midst of litigation with "an entity such as State Farm." This court excluded such evidence because the judicial privilege seeks to protect free access to the courts, and therefore, the mere existence of a lawsuit cannot be the basis of a defamation or tortious interference claim.[155]

B. Introduction of the "Midtown Memo" would have resulted in unfair prejudice.

Plaintiffs sought to introduce State Farm's "Midtown Memo" to demonstrate State Farm's common plan or scheme in targeting chiropractors.[156] The "Midtown Memo" was a document during a wholly unrelated litigation filed by State Farm in federal court alleging fraud against several medical providers.[157] Apparently, the memo detailed State Farm's plan to use a deposition to gain information on a chiropractor that had been reluctant to speak with Babin.[158]

Initially, it is worth noting that this court never explicitly excluded introduction of the "Midtown Memo" in pre-trial motions, and plaintiffs never attempted introduce the memo at trial. Plaintiffs argue this court's exclusion of evidence of acts taken after August 31, 2005, as

---

[154] *Id.* at *101, 4-12 (emphasis added).
[155] *See Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super Ct. 1987) (upholding trial court sustaining preliminary objections because the existence of an earlier lawsuit filed by the defendant against the plaintiff cannot be the basis of defamation or tortious interference claims since a lawsuit is absolutely judicially privileged).
[156] Pl. Post-Trial Memo, *47.
[157] Def. Post-Trial Memo, *47-48, FN 19.
[158] Pl. Post-Trial Memo, *47-48.

31

the reason why the memo was inadmissible;[159] however, it is not clear the memo was written after August 31, 2005.

Plaintiffs' counsel, Jonathan Cass, wrote defendants an e-mail prior to trial asking for the "original date" of the memorandum—which he believed was "sometime in 2000."[160] Furthermore, this court deferred ruling on defendants' motion in limine to exclude evidence of "unrelated lawsuits"—in which the Midtown lawsuit and memo were explicitly referenced.[161] Consequently, it is not clear plaintiffs preserved this claim of error for post-trial motions.

Nevertheless, assuming, *arguendo*, that plaintiffs had attempted to introduce the "Midtown Memo" at trial, this court would have excluded it as unduly prejudicial pursuant to Pa.R.E. 403. Under Pa.R.E. 403, "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[162]

In this situation, allowing introduction of the "Midtown Memo" would have likely resulted in unfair prejudice by confusing the issues and misleading the jury; whereas, its probative value was minimal. If the memo were introduced, defendants would have been forced to re-litigate the reasonableness of their actions in the Midtown lawsuit—which resulted in a jury verdict in favor of State Farm[163]—and also defend the actions they took while investigating Cavoto. This could have easily resulted in confusion of the issues for the jury. Furthermore, the

---

[159] *Id.* at 47.
[160] Def. Post-Trial Memo, *49; Def. Post-Trial Ex. HH.
[161] *Cavoto v. State Farm, et al.*, 050601630, MIL Cntl # 16093543.
[162] Pa.R.E. 403.
[163] Def. Post-Trial Memo, *47-48, FN 19.

actions defendants took during a lawsuit, in which they were successful on the merits and which did not involve Cavoto, would have provided minimal probative value to plaintiffs' case.

Therefore, the Midtown Memo and testimony of Smith were properly excluded.

## VII. The Testimony of J'Amy Kluender Was Unfairly Prejudicial.

J'Amy Kluender ("Kluender") began working for State Farm's SIU eight years after this lawsuit was filed. Similar to the purpose for the "Midtown Memo", it seems the purpose of calling Kluender was to elicit testimony about State Farm's "habit or course of conduct in investigating other medical providers."[164] This court excluded such evidence on the basis of lack of personal knowledge and that its introduction would have been unfairly prejudicial.

Under Pa.R.E. 404(b), evidence of a party's crime, wrong, or other act is admissible if it is being introduced to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.[165] Under Pa.R.E. 406, evidence of a person's habit may be introduced to prove the person acted in accordance with that habit.[166]

In an unrelated lawsuit filed by a chiropractor against State Farm, the chiropractor submitted an affidavit from Kluender.[167] Apparently, the affidavit detailed State Farm's litigation practices and procedures followed by the Concordville SIU, the unit in which Babin worked.[168] During that lawsuit, State Farm was able to successfully place the affidavit under seal, where it remains.[169]

This court found Kluender's testimony would have been too attenuated to be admissible under either Pa.R.E. 404(b) or 406. First, Kluender did not begin her employment with State

---

[164] Pl. Post-Trial Memo, *49.
[165] Pa.R.E. 404(b)(2).
[166] *See* Pa.R.E. 406.
[167] *Cavoto v. State Farm, et al.*, 050601630, MIL Cntl. # 16093533, Def. Mot. ¶ 13.
[168] Pl. Post-Trial Memo, *50.
[169] MIL Cntl. # 16093533, Def. Mot. ¶ 17.

Farm until 2013—almost a decade after the events which led to this lawsuit.[170] As such, she had

no knowledge of State Farm's practices and procedures during the period in question. Second,

allowing evidence of State Farm's practices in unrelated lawsuits would create unfair prejudice

by forcing State Farm to re-litigate its actions in those matters. And third, evidence of State

Farm's policies in 2013 would have minimal probative value in proving what State Farm's

policies were between 2003 and 2005, as State Farm could have developed those policies any

time between 2005 and 2013.

Therefore, the testimony of Kluender was properly excluded during pre-trial motions.

## VIII. Testimony of State Farm's "Hardball" Litigation Tactics was Hearsay and Too Attenuated.

Plaintiffs sought to call Gary Heslin, Esquire ("Heslin") for the purpose to recounting a

conversation he had with Fred Smith, Esquire ("Fred Smith")—a partner at the Dion Rosenau

law firm. In that conversation, Fred Smith allegedly informed Heslin that State Farm would

investigate any medical provider who has recovered over $1,000,000 from State Farm insureds,

and use "hardball" litigation tactics in lawsuits involving the provider's office.[171] At trial, this

court excluded the testimony of Heslin because it was too attenuated and hearsay.

Plaintiffs argue Fred Smith's statement is admissible as a statement by a party opponent's

agent.[172] Yet, Fred Smith was not an employee or agent of State Farm, and did not have the

same extensive relationship with State Farm as Rosenau. Fred Smith does not become an agent

of State Farm simply by virtue of being Rosenau's colleague. Plaintiffs had several years to

locate a State Farm employee who could testify to this alleged company policy with sufficient

---

[170] MIL Cntl. # 16093533, Def. Mot. ¶ 14.
[171] MIL Cntl. # 16093495, Pl. Oppo. Memo, Ex. A, *39, 21 - *40, 10.
[172] Pl. Post-Trial Memo, *56-57.

34

personal knowledge, and apparently could not find one—further supporting the testimony's unreliability.

However, assuming, *arguendo*, this court erred in excluding the testimony, the error was harmless. As discussed *infra*, plaintiffs failed to establish any prospective or existing contractual relationship that State Farm could have tortuously interfered with. Heslin stated his relationship with Cavoto was not affected.[173] Therefore, even if Heslin's testimony were reliable and admissible, plaintiffs would have still failed to present a claim for tortious interference.

## IX. Aside From His Testimony Being Privileged, Robert Datner, Esquire Lacked Sufficient Knowledge to Testify.

Plaintiffs sought to call Robert Datner, Esquire ("Datner") to testify about "disparaging remarks" Rosenau had made about Cavoto during a deposition. This court excluded Datner's testimony due to lack of personal knowledge and the judicial privilege.

During his deposition, Datner could not recall any specific remark Rosenau allegedly made about Cavoto.[174] Instead, he stated: "I don't recall the specifics of what Rosenau said, but I do believe he made—I do have a specific recollection that it was a disparaging comment about Cavoto. . ."[175] Later on, Datner attempted to communicate the gist of Rosenau's statement.

> "I'm trying to recreate this without much memory here. I'm
> qualifying this statement by saying, *this is probably not what Mr.*
> *Rosenau said*, but my recollection of what he said was something
> along the lines of, 'Cavoto's trouble. Be careful in dealing with
> him' something like that."[176]

---

[173] MIL Cntl. # 16093495, *29, 9-11.
[174] Def. Post-Trial Memo, Ex. R, at *13, 1-5.
[175] *Id.* at *13, 2-5.
[176] *Id.* at *85, 3-9 (emphasis added).

35

In order to establish a claim of defamation, the plaintiff must specifically plead and prove the defamatory statement.[177] Here, Datner could not recall the statement, and even admitted he is "without much memory here." As such, he did not have sufficient personal knowledge to testify.

Even disregarding Datner's speculative memory, Rosenau's statements were protected by judicial privilege. One thing Datner recalled for certain was that Rosenau's statements occurred during a deposition "in the course of handling an accident case involving Cavoto as treating chiropractor."[178]

Thus, the statements were made in the course of judicial proceedings about a matter material and pertinent to the proceeding, and were properly excluded.

## X. Based on the Admitted Evidence, Grant of Nonsuit was Proper.

At the close of plaintiffs' case in chief, defendants moved for a non-suit on all counts. This court partially granted the motion, dismissing all of the claims except the defamation claim against Rosenau.

Nonsuit may be entered only upon a finding that a jury, "viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had been established."[179] A trial court's grant of nonsuit is reversed only upon finding an abuse of discretion or an error of law.[180]

In their post-trial motion, plaintiffs argue it was error for this court: 1) to grant non-suit on the claim of tortious interference because an act of defamation constitutes tortious interference[181]; 2) to grant State Farm's motion for non-suit on the claim of defamation because

---

[177] See Graham, 468 A.2d at 457.
[178] Id. at *8, 2-6.
[179] Brinich v. Jencka, 757 A.2d 388, 402 (Pa. Super. Ct. 2000).
[180] See Harvey v. Rouse Chamberlin, Ltd., 901 A.2d 523, 526 (Pa. Super. Ct. 2006).
[181] Pl. Post-Trial Memo, *59.

36

Rosenau's statements are imputed to State Farm through the principles of agency;[182] and 3) to grant non-suit on the claim of conspiracy because, if no agency relationship was established between Rosenau and State Farm, there was sufficient evidence to establish an implicit agreement between them to injure Cavoto's reputation.[183]

After reviewing plaintiffs' arguments, this court finds: 1) any error with respect to plaintiffs' claim for tortious interference was harmless; 2) Rosenau was not acting as State Farm's agent during his conversation with Bendo; and 3) there was insufficient evidence of State Farm's participation or involvement to support a claim for conspiracy.

A. Plaintiffs failed to establish the basic elements of a tortious interference claim.

To establish a claim for tortious interference with contractual relationships, a contractual or prospective contractual relationship must be shown. By the close of its case-in-chief, plaintiffs had failed to establish that essential element. In fact, Cavoto explicitly denied it existed.[184] As such, there was insufficient evidence from which a reasonable jury could conclude that a contractual relationship had been interfered with. Therefore, the count was properly dismissed as to all defendants, and any harm to Cavoto's business based on statements made about Cavoto would have to be pursued under a claim for defamation.

B. There was insufficient evidence suggesting State Farm directed or participated in the defamatory conduct.

Plaintiffs presented one witness, Bendo, to support a claim for defamation against both defendants. Bendo recounted two phone conversations he had with Rosenau in which Rosenau

---

[182] *Id.* at *56.
[183] *Id.* at *58.
[184] Record, 11/4/2016, *25, 14 - *26, 16.

allegedly made disparaging statements about Cavoto.[185] This court held the first conversation was absolutely privileged, but allowed the second conversation to be presented to the jury.

Plaintiffs contend that Rosenau's statements in that phone conversation should be imputed to State Farm through the principles of agency. Plaintiffs argue an attorney is an agent of his client, and "any acts performed and statements made by the attorney *within the scope* of his or her own employment and authority are binding upon the *client*."[186] This is a correct principle of law, and this court employed it to impute Dickman's statements to Cavoto; however, the context of Rosenau's conversation and his relationship with State Farm are distinguishable.

First, this court allowed the second conversation to be admitted because Rosenau was not speaking on a matter pertinent and material to any litigation in which he or his client was involved. In other words, he was acting *outside the scope* of his employment at the time. As such, the principles of agency would not impute his statements to State Farm.

Second, even assuming he was acting within the scope of his employment, State Farm is not Rosenau's client; rather, Rosenau's client is the insured of State Farm. Rosenau's relationship with State Farm is akin to the relationship parents may have with their child's attorney. While the parents typically retain and pay the fees of the attorney, the attorney's loyalty is to the child if there is ever a conflict between the goals of the child and parents. The same is true here. While State Farm is the one who retains Rosenau and ultimately pays his fees through the insured policyholder's coverage plan, the client and decision-maker in the litigation is the insured. As such, State Farm is, at best, an interested third-party.

---

[185] *See* Record, 11/2/2016, *109-114.
[186] Pl. Post-Trial Memo, *57 (citing *Weiner v. Lee*, 669 A.2d 424, 428 (Pa. Commw. Ct. 1995)) (emphasis added).

Therefore, in order to hold State Farm liable, plaintiffs needed to provide evidence that State Farm directed or participated in the publication of the defamatory statement.[187] Plaintiffs failed to do so.

The only defamatory statement admitted into evidence was one where Rosenau gave advice on how Bendo should handle all cases involving Cavoto—including future cases that would not involve State Farm. Plaintiffs failed to present any evidence even suggesting State Farm directed Rosenau to provide advice to Bendo on how to manage those cases.

Therefore, because there was no evidence establishing either an agency relationship or that State Farm participated in Rosenau's statements statements, this court correctly determined a claim for defamation was not established against State Farm.

C. A claim for conspiracy cannot stand against one bad actor.

A claim for conspiracy cannot lie without an underlying tort, and an individual cannot conspire with himself.[188] To state a claim for conspiracy, a plaintiff must show: "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."[189]

After defendants' motion for nonsuit, the only remaining claim was defamation against Rosenau. Absent evidence of State Farm's involvement or participation in Rosenau's defamatory statements, a claim for conspiracy cannot lie.

As discussed more fully in the previous section, Rosenau acted on his own accord in his second conversation with Bendo. Therefore, because plaintiffs failed to present evidence of two actors conspiring to achieve an improper goal, the conspiracy claim was properly dismissed.

---

[187] *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1043 (Pa. 1996).
[188] *See Rock v. Rangos*, 61 A.3d 239, 249 (Pa. Super. Ct. 2013).
[189] *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

39

## CONCLUSION

Wherefore, for the reasons contained above, plaintiffs' post-trial motion for a new trial is denied.

BY THE COURT:

GLAZER, J.